FILED

2007 Jun-22  AM 11:04
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **MARGARET DALY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **AETNA LIFE INSURANCE** | ) | **Civil Action No. 06-S-2064-NE** |
| **COMPANY, d/b/a AETNA LIFE** | ) | |
| **AND CASUALTY COMPANY** | ) | |
| **and/or TRAVELERS CASUALTY** | ) | |
| **AND SURETY COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### MEMORANDUM OPINION

This is an action for the recovery of disability insurance benefits, filed by plaintiff, Margaret Daly, against her insurer, defendant Aetna Life Insurance Company.  Plaintiff commenced this action on September 12, 2006 in the Circuit Court of Madison County, Alabama.[1]   In her complaint, plaintiff prayed for compensatory damages of $821.53 a month for each month of unpaid benefits, and other damages, including punitive damages.[2]   The sole defendant removed the action to this court, relying principally upon federal question jurisdiction pursuant to 28 U.S.C. § 1331 and the Employee Retirement Income Security Act of 1974

---

[1] Doc. no. 1 (Notice of Removal), Ex. A (State Court Complaint).

[2] *Id.*

("ERISA"), 29 U.S.C. § 1001 *et seq.*[3]   Defendant further relied on diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1).[4]   Plaintiff has now moved to remand, challenging both federal question and diversity jurisdiction. [5]

## PART ONE

### *Diversity Jurisdiction*

Any civil action instituted in a state court may be removed to a federal forum, provided the district court has original jurisdiction over the controversy. *See* 28 U.S.C. §§ 1332, 1441(a); *see also*, *e.g.*, *Tapscott v. MS Dealer Service Corp.*, 77 F.3d. 1353, 1356 (11th Cir. 1996), *overruled on other grounds by Cohen v. Office Depot*, *Inc.*, 204 F.3d 1069 (11th Cir. 2000).

In addition to the authority to decide cases involving federal causes of action, a federal court has jurisdiction over actions between citizens of different states, so long as the citizenship of all plaintiffs is diverse from the citizenship of all defendants, *Strawbridge v. Curtiss*, 7 U.S. 267, 267 (1806), and the amount in controversy exceeds the statutorily prescribed, minimum amount:   presently

---

[3] *See id.*

[4] *Id.*

[5] Doc. no. 5 (Motion to Remand).

$75,000.  *See* 28 U.S.C. § 1332(a)(1).  Because not all actions that are amenable to federal jurisdiction are initiated in federal court, Congress has enacted a procedure for defendants to "remove" such cases.

> Except as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or defendants, to the district court of the United States for the district and division embracing the place where such action is pending.  For purposes of removal under this chapter, the citizenship of defendants sued under fictitious names shall be disregarded.

28 U.S.C. § 1441(a).

"A removing defendant has the burden of proving the existence of federal jurisdiction."  *Tapscott*, 77 F.3d at 1356; *see also*, *e.g.*, *Leonard v. Enterprise Rent A Car*, 279 F.3d 967, 972 (11th Cir. 2002) (same); *Williams v. Best Buy Co.*, *Inc.*, 269 F.3d 1316, 1319-20 (11th Cir. 2001) (same).

## A.    Requirement of "Complete Diversity"

As alluded to above, jurisdiction under 28 U.S.C. § 1332 requires "complete diversity" — *i.e.*, the citizenship of every plaintiff must be diverse from the citizenship of every defendant.  *See*, *e.g.*, *Palmer v. Hospital Authority of Randolph County*, 22 F.3d 1559, 1564 (11th Cir. 1994) (citing *Strawbridge*, 7 U.S. at 267).

Here, the facts regarding complete diversity of citizenship are not in material dispute. Plaintiff resides in Madison County, Alabama.[6] Defendant is a duly organized corporation.[7] Federal law provides that a corporation "shall be deemed a citizen of any State by which it has been incorporated and of the State where it has its principal place of business." 28 U.S.C. § 1332(c)(1). Defendant in this case is incorporated in Connecticut, and maintains its principal place of business in that same State.[8] Because plaintiff and defendant do not share citizenship, complete diversity exists. *See*, *e.g.*, *Palmer*, 22 F.3d at 1564.

## B.    The Amount in Controversy Requirement

"When jurisdiction is premised on the diversity of the parties, the court is obligated to assure itself that the case involves the requisite amount in controversy." *Morrison v. Allstate Indemnity Co.*, 228 F.3d 1255, 1261 (11th Cir. 2000) (citing *Laughlin v. Kmart Corp.*, 50 F.3d 871, 873-74 (10th Cir. 1995), and *Meritcare, Inc. v. St. Paul Mercury, Inc.*, 166 F.3d 214, 218 (3d Cir. 1999)). When determining whether subject matter jurisdiction exists under the diversity

---

[6] Doc. no. 1, Ex. A.

[7] *Id.*

[8] Doc. no. 3 (Corporate Disclosure Statement); doc. no. 1.

statute, district courts must focus upon the amount that was in controversy on the date the case was removed from state court.  *See*, *e.g.*, *Burns v. Windsor Insurance Co.*, 31 F.3d 1092, 1097 n.13 (11th Cir. 1994).  Additionally, it is well settled in the Eleventh Circuit that the amount in controversy is evaluated from the plaintiff's viewpoint.  *See Ericsson GE Mobile Communications v. Motorola Communications & Electronics*, *Inc.*, 120 F.3d 216, 218-20 (11th Cir. 1997).

In her complaint, plaintiff alleges that she "has been shorted about $821.53 per month since 1999 or approximately 91 months to date."[9]  Plaintiff seeks compensatory damages of $821.53 for each month of unpaid benefits and other damages, including punitive damages and compensation for emotional suffering, mental anguish, and distress.[10]  On its face, plaintiff's complaint seeks compensatory damages for unpaid benefits in the amount of $74,759.23 ($821.53 multiplied by 91 months) through the date of filing, September 7, 2006.[11]  Significantly, however, this figure does not include other damages sought by plaintiff, nor does she specify the exact amount of such additional damages. When

---

[9] Doc. no. 1, Ex. A, p. 7.

[10] *Id*. at Count 1, ¶ 13.

[11] *Id*.

a plaintiff "fails to specify the total amount of damages demanded" in a state court complaint — either by demanding a specific sum in compensatory damages, but an indefinite amount as punitive damages, or by not designating any amounts at all — then "a defendant seeking removal based on diversity jurisdiction must prove by a preponderance of the evidence that the amount in controversy exceeds the $75,000 jurisdictional requirement." *Leonard*, 279 F.3d at 972 (citing *Tapscott*, 77 F.3d at 1356-57).

Plaintiff correctly asserts that, at the time of filing, she was owed an amount less than $75,000 in unpaid benefits.[12]  However, this fact alone does not rule out diversity jurisdiction.  Plaintiff plainly seeks $74,759.23 in compensatory damages for unpaid benefits in her complaint.  Further, plaintiff demands compensation for emotional distress, and punitive damages.  It is more likely than not that, if the case were remanded, and plaintiff thereafter prevailed on these demands following a trial on the merits, an award for such damages would certainly be greater than $240.77.  In other words, when damages are assessed from plaintiff's viewpoint, it is clear that defendant has carried its preponderance burden of showing a sufficient amount in controversy to activate this court's diversity jurisdiction.

---

[12] Doc. no. 5, p. 2.

Moreover, as discussed below, even if diversity jurisdiction were lacking, removal would be proper because this case involves a federal question.

## PART TWO

### *Federal Question Jurisdiction*

The Eleventh Circuit Court of Appeals has succinctly summarized the parameters of federal question jurisdiction:

> Under the federal question jurisdiction statute, 28 U.S.C. § 1331, a district court has subject matter jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." Whether a claim arises under federal law for the purposes of 28 U.S.C. § 1331 is generally determined by the well-pleaded complaint rule, "which provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint." *Caterpillar*, *Inc. v. Williams*, 482 U.S. 386, 392 (1987). A well-pleaded complaint presents a federal question where it "establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." *Franchise Tax Bd. v. Construction Laborers Vacation Trust for S. Cal.*, 463 U.S. 1, 27-28 (1983).

*Smith v. GTE Corp.*, 236 F.3d 1292, 1310 (11th Cir. 2001).

Building upon these principles, the Supreme Court has observed that, "[t]o remove a case as one falling within federal-question jurisdiction, the federal question ordinarily must appear on the face of a properly pleaded complaint; an

anticipated or actual federal defense generally does not qualify a case for removal." *Jefferson County v. Acker*, 527 U.S. 423, 430-31 (1999).

An important exception has developed as a corollary to this well-pleaded complaint rule, however:  "Congress may so completely pre-empt a particular area [of the law] that any civil complaint raising this select group of claims is necessarily federal in character."  *Metropolitan Life Insurance Co. v. Taylor*, 481 U.S. 58, 63-64 (1987).  This is known as the "complete preemption" doctrine, and it comes into play when "the pre-emptive force of a statute is so 'extraordinary' that it 'converts an ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule.'"  *Caterpillar*, *Inc*., *v. Williams*, 482 U.S. 386, 392 (1987) (quoting *Taylor*, 481 U.S. at 65).   The complete preemption doctrine has been applied frequently to claims falling within the purview of ERISA.  *See*, *e.g*., *Taylor*, 481 U.S. at 60; *see also BLAB T.V. of Mobile*, *Inc. v. Comcast Cable Communications*, *Inc*., 182 F.3d 851, 855 (11th Cir. 1999).

In this case, the central issue is whether plaintiff's purported breach of contract claim for unpaid benefits pertains to an employee welfare benefit plan

governed by ERISA.[13]   Plaintiff asserts that her claim does not involve such a plan, and suggests that her claim results from a plan she purchased directly from defendant without maintenance by, or contribution from, any employer.[14]   The court is not persuaded by this unsupported allegation.   Defendant provided an affidavit from one of its Disability Analysts, Annemarie Barden, explaining that plaintiff's coverage under the Saint Barnabas Medical Center Disability Plan at issue here "is the only insurance coverage that Plaintiff has with [defendant]." [15]   Specifically, plaintiff's disability coverage consisted of primary long term disability benefits and optional buy-up long term disability benefits.[16]   Plaintiff has tendered no contrary proof.

## A.    Is the Disability Benefits Plan Subject to ERISA?

### 1.    Overview of ERISA

Congress enacted ERISA to defend "the interests of participants in employee benefit plans and their beneficiaries."   29 U.S.C. § 1001.

---

[13] Doc. no. 7 (Defendant's Opposition to Motion to Remand).

[14] Doc. no. 5, p. 3.

[15] Doc. no. 7, Ex. 2 (Second Affidavit of Annemarie Barden), ¶ 4.

[16] *Id*. at Ex. 2(A), "Aetna -0610" (Plaintiff's Benefits Confirmation Statement).

In passing ERISA, Congress's purpose was twofold: to protect employees and to protect employers. *See McMahon* [*v. Digital Equipment Corp.*, 162 F.3d 28, 35-36 (1st Cir. 1998)]. Congress wanted to safeguard employee interests by reducing the threat of abuse or mismanagement of funds that had been accumulated to finance employee benefits, *see Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 15 (1987), while at the same time safeguarding employer interests by eliminating "the threat of conflicting and inconsistent State and local regulation" of employee benefit plans, *[New York State Conference of Blue Cross & Blue Shield v. Travelers Insurance Co.*, 514 U.S. 645, 657 (1995) (quoting 120 Cong. Rec. 29197 (1974))].

*Demars v. CIGNA Corp.*, 173 F.3d 443, 446 (1st Cir. 1999).

ERISA governs "employee benefit plans," 29 U.S.C. § 1003, and all "employee welfare benefit plans," such as group sickness or disability programs, are also "employee benefit plans." *Id.* at §§ 1002(1)(A), (3). The Act defines an "employee welfare benefit plan" for purposes of ERISA governance as being:

any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer . . . for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, . . . benefits in the event of sickness, accident, disability, death or unemployment.

*Id.* at § 1002(1). Therefore, in order for an employee plan to be governed by ERISA, there must be (1) a plan, fund, or program (2) established or maintained (3) by an employer or an employee organization (4) for the purpose of providing "benefits in the event of sickness, accident, disability, death or unemployment" (5)

to plan participants and their designated beneficiaries.  *See*, *e.g.*, *Anderson v. UNUM Provident Corp.*, 369 F.3d 1257, 1263 (11th Cir. 2004); *Glass v. United of Omaha Life Insurance Co.*, 33 F.3d 1341, 1345 (11th Cir. 1994); *Donovan v. Dillingham*, 688 F.2d 1367, 1371 (11th Cir. 1982) (*en banc*).

Before diving into this potentially complex analysis, however, "courts usually begin by examining whether the plan falls into the regulatory safe harbor, which excludes from ERISA's jurisdictional ambit certain group or group-type insurance programs offered by an insurer to employees or members of an employee organization."  *Anderson*, 369 F.3d at 1263 n.2.  Assuming this so-called "safe harbor" provision applies, ERISA does not; consequently, state law claims ordinarily preempted by the Act would remain viable.  *Id.* at 1262.  The pertinent regulation provides as follows:

> For purposes of title I of the Act and this chapter, the terms "employee welfare benefit plan" and "welfare plan" shall not include a group or group-type insurance program offered by an insurer to employees or members of an employee organization, under which
>
> (1)  No contributions are made by an employer or employee organization;
>
> (2)  Participation [in] the program is completely voluntary for employees or members;

(3)  The sole functions of the employer or employee organization with respect to the program are, without endorsing the program, to permit the insurer to publicize the program to employees or members, to collect premiums through payroll deductions or dues checkoffs and to remit them to the insurer; and

(4)  The employer or employee organization receives no consideration in the form of cash or otherwise in connection with the program, other than reasonable compensation, excluding any profit, for administrative services actually rendered in connection with payroll deductions or dues checkoffs.

29 C.F.R. § 2510.3-1(j).

In keeping with the accepted practice, the court first considers whether this "safe harbor" provision applies.  If it does not, then the court will be obligated to examine the other prerequisites for qualification as an ERISA benefit plan.  *See Anderson*, 369 F.3d at 1263 n.2 (noting that "a plan that falls outside of the safe harbor exception does not necessarily fall within the jurisdiction of ERISA").

## 2.    Does the Disability Benefits Plan Fall Within the Regulatory "Safe Harbor"?

At the outset, it is notable that "[the] failure to meet even one of the factors [listed in 29 C.F.R. § 2510.3-1(j)] will keep a plan out of the statutory safe harbor."  *Shipley v. Provident Life & Accident Insurance Co.*, 352 F. Supp. 2d 1213, 1216 (S.D. Ala. 2004).  This is critical because defendant's only contention

is that the plan fails to meet the third prong.[17]   Plaintiff, for her part, does not

adequately address the four prongs of the "safe harbor" exception, but does clearly

oppose defendant's position.[18]   With the battle lines thus drawn, the court must

now determine whether:

> [t]he sole functions of the employer or employee organization with
> respect to the program are, without endorsing the program, [1] to
> permit the insurer to publicize the program to employees or members,
> [2] to collect premiums through payroll deductions or dues checkoffs
> and [3] to remit them to the insurer[.]

29 C.F.R. § 2510.3-1(j)(3) (bracketed alterations supplied).

According to the Department of Labor:

> An employee organization will be considered to have endorsed
> a group or group-type insurance program if the employee
> organization expresses to its members any positive, normative
> judgment regarding the program.  An employee organization, may, in
> the course of permitting an insurer, insurance agent, or insurance
> broker to market the group or group-type insurance program to its
> employees or members, facilitate the publicizing and marketing of the
> program, but only to an extent short of endorsing the program.  An
> endorsement within the meaning of [§] 2510.3-1(j) occurs if the
> employee organization urges or encourages member participation in
> the program or engages in activities that would lead a member
> reasonably to conclude that the program is part of a benefit
> arrangement established or maintained by the employee organization.

---

[17] Doc. no. 7, p. 13.

[18] Doc. no. 5, pp. 6-7.

*Moorman v. UnumProvident Corp.*, 464 F.3d 1260, 1267 (11th Cir. 2006) (quoting ERISA Op. Letter No. 94-26A, 1994 WL 369282 (July 11, 1994)).

"The regulation explicitly obliges the employer who seeks its safe harbor to refrain from any functions other than permitting the insurer to publicize the program and collecting premiums." *Butero v. Royal Maccabees Life Insurance Co.*, 174 F.3d 1207, 1213 (11th Cir. 1999) (emphasis deleted). Accordingly, the "safe harbor" analysis will turn on whether plaintiff's employer, Saint Barnabas Health Care System ("SBHCS"), endorsed the group insurance plan insured by defendant, or, undertook additional functions with respect to the plan.

The evidence indicates that SBHCS does more than simply collect premiums and permit the defendant insurer to publicize the program. For example, SBHCS determines which employees are eligible to participate in the plan, oversees enrollment, furnishes employees with a summary plan description that incorporates the terms of the optional buy-up and primary long term disability coverage, and provides claim forms.[19] Additionally, SBHCS "reserves the right to terminate, modify, or amend [the benefit plan] at any time without notice."[20]

---

[19] Doc. no. 7, Ex. 1(A) (Benefits on Call Summary Plan Description), pp. 5-7, 50-51.

[20] *Id.* at 70.

The cases show that these badges of participation, even when viewed in the light most favorable to plaintiff, *see Anderson*, 369 F.3d at 1262, are more than sufficient to bring the disability policy outside the "safe harbor" provision.  In *Shipley v. Provident Life & Accident Insurance Co.*, 352 F. Supp. 2d 1213 (S.D. Ala. 2004), for example, another court in this Circuit confronted a similar situation and held that the "safe harbor" was barred.  The plaintiff there conceded that the primary long term disability policy offered through her employer was subject to ERISA, but contended that the supplemental or optional disability policy fell within the "safe harbor" regulation.  *Id.* at 1215.  One issue was whether the employer's conduct satisfied the endorsement prong.  *See id.*  After reviewing the evidence, the court noted that, as here, "AmSouth [the employer] selected Provident as the sole insurer" of its supplemental plan.  *Id.* at 1216.  Similar to the present situation, the supplemental plan was voluntary, but in the event an employee elected to participate, the insurer was not negotiable.  *See id.*  Moreover, AmSouth "was involved in the selection of the terms of the policies," and "had interaction with Provident concerning policy premiums, coverages, changes and other aspects central to the maintenance of the [supplemental] plan."  *Id.*  In light

of these factors, the court in *Shipley* held that the employer had been more active than the "safe harbor" permits.  *See id.*

The Eleventh Circuit also has confronted a similar set of facts.  In *Butero v. Royal Maccabees Life Insurance Co.*, 174 F.3d 1207 (11th Cir. 1999), the court explained its reasoning in rejecting a claim that the "safe harbor" applied by noting that the "safe harbor" regulation prohibits an employer from engaging in "any functions other than permitting the insurer to publicize the program and collecting premiums."  *Id.* at 1213-14 (emphasis deleted).  After reviewing the evidence, the court noted:

> Simply Fashion [the employer] did a lot more.  It picked the insurer; it decided on key terms, such as portability and the amount of coverage; it deemed certain employees ineligible to participate; it incorporated the policy terms into the self-described summary plan description for its cafeteria plan; and it retained the power to alter compensation reduction for tax purposes.  So the safe harbor is barred.

*Id.* at 1213-14 (footnote omitted).

SBHCS's participation is comparable in many respects to that of the employers in *Butero* and *Shipley*.  Specifically, the court notes that SBHCS is identified by the summary plan description as being the plan administrator, provides claim forms, and determines at least some aspects of eligibility.  Thus, the court concludes that the endorsement element is not met — *i.e.*, SBHCS has

-16-

failed to refrain from "endorsing" the policy.  Accordingly, the "safe harbor" is not available.  *See id*. at 1214; *Shipley*, 352 F. Supp. 2d at 1216.

### 3.     Does the Disability Benefit Plan Otherwise Qualify as an ERISA Benefit Plan?

Having concluded that the "safe harbor" is out of reach, the court now must turn to "the high-seas definition of an 'employee welfare benefit plan' to see if the [disability] insurance policy here qualifies." *Butero*, 174 F.3d at 1214.

As discussed above, in order for an employee plan to be governed by ERISA, there must be (1) a plan, fund, or program (2) established or maintained (3) by an employer or by an employee organization (4) for the purpose of providing benefits (5) to plan participants or their designated beneficiaries.  *See*, *e.g.*, *Anderson*, 369 F.3d at 1263.  Plaintiff contends that the optional buy-up long term disability benefits are not "established or maintained" by SBHCS.[21]  The "established or maintained" language comes from element two, but after reading plaintiff's submission, it appears that plaintiff really is challenging the confluence of elements two and three.[22]

---

[21] Doc. no. 5, p. 7.

[22] Plaintiff does not contest the other elements.  *See generally id.* at pp. 4-7.

Quoting with approval a Tenth Circuit case, the panel in *Anderson* explained that "the 'established or maintained' requirement is designed to ensure that the plan is part of an employment relationship." *Id.* (quoting *Gaylor v. John Hancock Mutual Life Insurance Co.*, 112 F.3d 460, 464 (10th Cir. 1997)) (some alterations deleted). This is done by "looking at the degree of participation by the employer in the establishment or maintenance of the plan." *Id.* The court must "examine all the surrounding facts and circumstances," *id.* at 1264, ever mindful of the fact that "[a] *decision* to extend benefits is not the establishment of a plan or program." *Donovan*, 688 F.3d at 1373 (emphasis supplied). Rather, "[a] plan is 'established' when there has been some degree of implementation by the employer going beyond a mere intent to confer a benefit."[23] *Butero*, 174 F.3d at 1214. Factors suggestive of plan "maintenance" include involvement in the payment of

---

[23] Without departing from the totality inquiry, the Eleventh Circuit has promulgated a non-exclusive list of seven factors that may indicate establishment or maintenance by an employer:

> (1) the employer's representations in internally distributed documents; (2) the employer's oral representations; (3) the employer's establishment of a fund to pay benefits; (4) actual payment of benefits; (5) the employer's deliberate failure to correct known perceptions of a plan's existence; (6) the reasonable understanding of employees; and (7) the employer's intent.

*Butero*, 174 F.3d at 1215; *see also Anderson*, 369 F.3d at 1265 (noting that "[t]hese factors are equally important in determining whether an employer *maintained* the plan") (emphasis in original).

benefits, performance of "all the administrative functions," and alteration of "critical terms of the policy." *Anderson*, 369 F.3d at 1265.

In the present case, there is no need to determine whether SBHCS "maintained" the disability benefits plan because the court has little doubt the SBHCS "established" this plan. SBHCS contracted with defendant to provide a disability benefits plan to its employees,[24] and SBHCS collected employee premiums through payroll deductions.[25] *Cf. Anderson*, 369 F.3d at 1266 (finding establishment where the employer "brought the UNUM Plan into existence by choosing the insurance provider"); *Butero*, 174 F.3d at 1214 (finding establishment in part because the employer "consulted an insurance agent, selected the terms of the group policy it wished to purchase for its employees, completed an application form for the policy, solicited enrollments from its employees, collected money through payroll deductions, and remitted premium checks to Royal Maccabees"). SBHCS selected defendant's plan as the sole disability benefit plan offered to its employees.[26] *Cf. Anderson*, 369 F.3d at 1265 (finding

---

[24] Doc. no. 7, Ex. 1(D) (Letter from SBHCS in-house counsel to plaintiff's attorney).

[25] *Id.* at Ex. 1(A), p. 6.

[26] *Id.* at p. 72.

establishment where the employer "selected the UNUM Plan as the sole long term disability plan offered by [the employer]"). SBHCS limited eligibility for its disability benefits plan to full-time employees with elections becoming effective after working with SBHCS for three months.[27] *Cf. id.* (finding establishment where the employer "limited eligibility to hourly employees who had completed a three-month waiting period, making the UNUM Plan a benefit closely tied to the employer-employee relationship"). SBHCS also involved itself in the payment of benefits by maintaining and distributing a supply of claim forms. [2][8]

Moreover, SBHCS "identified itself, in internally distributed documents to employees, with the [disability benefits] plan."[29] *Shipley*, 352 F. Supp. 2d at 1217. The summary plan description provided to SBHCS employees bears the SBHCS logo and monogram.[30] The summary plan description contains a disclaimer, noting that SBHCS "reserves the right to terminate, modify, or amend [the benefit plans] at any tine without notice."[31] Finally, the plaintiff's own benefits

---

[27] *Id.* at pp. 6-7.

[28] *Id.* at p. 62.

[29] *Id* at pp. 50, 72.

[30] *Id.* at p. 1.

[31] *Id.* at p. 70.

confirmation statement indicates that the statement shows the "benefit elections under the Saint Barnabas Health Care System benefit program."[32]   All of these factors are strongly reminiscent of the factual situation that led the court in *Anderson* to conclude that the "establishment" element was satisfied:

> Shaw's representations in its internally distributed documents suggested that Shaw itself established the UNUM Plan.  The Shaw Emblem appears on all of the documents related to the UNUM Plan, including the Benefits Portfolio, the UNUM Plan Booklet, the enrollment form, and the claim form.  Shaw includes the UNUM Plan in a comprehensive list of employee benefits and refers to the UNUM Plan as the "Shaw Optional Long Term Disability Plan."

*Anderson*, 369 F.3d at 1266.

For all of the foregoing reasons, the court finds that — even viewing the evidence in the light most favorable to plaintiff, *see id.* at 1262 — it is nonetheless patently clear that SBHCS "established" the disability benefits plan.  Thus, the disability benefit plan, including the primary and optional buy-up long term disability coverage, is governed by ERISA.  *See Butero*, 174 F.3d at 1215.

## B.    ERISA Preemption

Important consequences flow from the court's conclusion that the disability benefit plan is governed by ERISA.  Most notably, as outlined above, ERISA

---

[32] *Id.* at Ex. 2(A), "Aetna – 0610."

broadly preempts state law.  *E.g.*, *Hardy v. Welch*, 135 F. Supp. 2d 1171, 1177 (M.D. Ala. 2000).  The courts have identified two distinct ways in which this may occur.  *Id.* at 1178 ("Preemption based on ERISA may take one of two forms.").

The first form of ERISA preemption, known as "complete" or "super" preemption, "arises from Congress's creation of a comprehensive remedial scheme in 29 U.S.C. § 1132 for loss or denial of employee benefits."  *Butero*, 174 F.3d at 1211 (citing *Taylor*, 481 U.S. at 63-64).  The fundamental principal is that, "[w]hen Congress comprehensively occupies a field of law, 'any civil complaint raising this select group of claims is necessarily federal in character' and thus furnishes subject-matter jurisdiction under 28 U.S.C. § 1331."  *Id.* at 1211-1212 (quoting *Taylor*, 481 U.S. at 63-64).  In complete preemption cases, state law claims are not dismissed, but are "recharacterize[d] . . . into a federal claim under § 1132."  *Ervast v. Flexible Product Co.*, 346 F.3d 1007, 1014 (11th Cir. 2003) (emphasis deleted).  The doctrine is thus primarily useful for jurisdictional questions.  *Id.* ("The issue of complete preemption is jurisdictional; meaning, if the claims are not completely preempted, they are not properly removed and must be remanded to state court.").

The other form of preemption is referred to as "defensive" preemption.  *See*, *e.g.*, *Cotton v. Massachusetts Mutual Life Insurance Co.*, 402 F.3d 1267, 1281 (11th Cir. 2005); *Butero*, 174 F.3d at 1212.  Defensive preemption is derived from ERISA's explicit preemption provision, 29 U.S.C. § 1144(a).  *Cotton*, 402 F.3d at 1281.  Section 1144(a) states that ERISA provisions "shall supersede any and all State laws insofar as they may now or hereafter relate to any [ERISA-governed] employee benefit plan."[33]   29 U.S.C. § 1144(a).   The effect of defensive preemption is to "provide[] . . . an affirmative defense to certain state-law claims." *Hardy*, 135 F. Supp. 2d at 1178.  As such, "defensive preemption does not furnish federal subject matter jurisdiction under 28 U.S.C. § 1331 . . . . On the other hand, defensive preemption does require dismissal of state-law claims."  *Butero*, 174 F.3d at 1212; *see also Ervast*, 346 F.3d at 1014 ("The defensive preemption issue . . . is substantive; therefore, either in state or federal court, when a state law claim is brought, the defendant may raise the defense that the claims are preempted by ERISA under § 1144, and should be dismissed.").   Of course, if defensive

---

[33] The Eleventh Circuit has held that "[a] party's state law claim 'relates to' an ERISA benefit plan for purposes of ERISA preemption whenever the alleged conduct at issue is intertwined with the refusal to pay benefits."  *Garren v. John Hancock Mutual Life Insurance Co.*, 114 F.3d 186, 187 (11th Cir. 1997).

preemption applies and state law claims are dismissed, claims asserted under ERISA itself remain a part of the lawsuit.

Defendant asserts that plaintiff's claims are completely preempted by ERISA; therefore, removal to this court was proper and plaintiff's motion to remand should be denied.[34]  There is complete preemption under ERISA when four elements are satisfied.  *Butero*, 174 F.3d at 1212.

> First, there must be a relevant ERISA plan.  Second, the plaintiff must have standing to sue under that plan.  Third, the defendant must be an ERISA entity.  Finally, the complaint must seek compensatory relief akin to that available under § 1132(a); often this will be a claim for benefits due under a plan.

*Id.* (internal citations omitted).

In this case, it is not necessary to discuss the second, third, or fourth elements because the plaintiff, in her motion to remand, challenges only the first element.[35]  Since this court has already concluded that the SBHCS disability benefit plan is governed by ERISA, it is clear that the first element is met.  *Id.* at 1215 (noting that finding "that the insurance policy was part of an 'employee welfare benefit plan' governed by ERISA . . . means that we have a relevant

---

[34] Doc. no. 7.

[35] *See generally* doc. no. 5.  Plaintiff did not address the other elements required for complete preemption under ERISA as outlined in defendant's notice of removal.  *See* doc. no. 1.

ERISA plan").  In light of this finding, there is no doubt that plaintiff's state law breach of contract claim is completely preempted.

## PART THREE

### *Conclusion*

In accordance with the foregoing, plaintiff's motion to remand is due to be denied.  An appropriate order consistent with this memorandum opinion will be entered contemporaneously herewith.

DONE this 22nd day of June 2007.

_____
United States District Judge